UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

HECTOR A. COVARRUBIAS,

                Plaintiff,

v.

CAROLYN W. COLVIN,

                Defendant.

Case No.: 15-CV-2664-DMS(WVG)

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**[Doc. Nos. 14, 16.]**

This is an action for judicial review of a decision by the Commissioner of Social Security, Carolyn W. Colvin ("the Commissioner," or "Defendant"), denying Plaintiff Hector A. Covarrubias ("Plaintiff") supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act"). The parties have filed cross-motions for summary judgment, and the matter is before the undersigned Magistrate Judge for preparation of a Report and Recommendation, which will be submitted to the Honorable Dana M. Sabraw, United States District Judge. *See* 28 U.S.C. § 636; CivLR 72.1(c). For the reasons stated below, the Court RECOMMENDS that Plaintiff's motion for summary judgment be DENIED,

Defendant's cross-motion for summary judgment be GRANTED, and judgment be entered accordingly.

## I.

## SUMMARY OF LEGAL BACKGROUND

Pursuant to the Act, the Social Security Administration ("SSA") administers the SSI program under Title 42 of the United States Code. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.*, 1381. Defendant, as Acting Commissioner of the SSA at the time of the Complaint's filing, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

### A.    SSA's Five-Step Sequential Process

The SSA employs a five-step sequential evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must show that (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. § 423(d)(1)(A), (2)(A); § 1382(c)(3)(A).

A claimant must meet both of these requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving that he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An

administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds that a claimant is disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny a claimant disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b). "Substantial work activity" is significant physical or mental work that a claimant does on a full or part-time basis. *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a). "Gainful work activity is work activity that you do for pay or profit," but the SSA will so classify any activity "if it is the kind of work *usually* done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b) (emphasis added).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to ascertain whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). The severity regulation requires that for a claimant to be disabled, the claimant must have "any impairment or combination of impairments which significantly limit" his or her "physical or mental ability to do basic work activities," with no allowance for "age, education, and work experience" given. 20 C.F.R. §§ 404.1520(c), 416.920(c). The duration requirement set forth in 20 C.F.R. § 404.1509 must be met by either a lone impairment or a combination of milder impairments. *Id.* § 404.1520(a)(4)(ii).

An ALJ will deny a claimant's disability claim if the ALJ does not find that a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." *Id.* § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b). Examples of basic work activities include: "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b)(1)-(6).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. ALJs are not yet required to consider age, education, and work experience at this stage. *Id.* § 404.1520(d).

If the ALJ has not yet deemed a claimant disabled, but before formally proceeding to step four, the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. §§ 404.1545(a)(1),

416.945(a)(1). In establishing a claimant's RFC, the ALJ must assess relevant medical and other evidence, as well as consider all of the claimant's impairments, including impairments categorized as non-severe. 20 C.F.R. § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant has the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 404.1520(f). The term "past relevant work" denotes work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years, or fifteen years prior to the date before which disability must be established. In addition, the work must have been substantial gainful activity and must have lasted long enough for the claimant to learn to do the job. *Id.* §§ 404.1560(b), 404.1565. So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. Conversely, if the claimant either cannot or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do *any* other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work

experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See* 20 C.F.R. §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report, and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. 20 C.F.R. §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial

review in a federal district court pursuant to 42 U.S.C. § 405(g) or § 1383(c). *See* 20 C.F.R. §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either make a decision or refer the matter to another ALJ. *Id.* § 404.983. The Appeals Council may also review an ALJ's decision *sua sponte* within sixty days of the decision. *Id.* § 416.1481.

## II.

## BACKGROUND

**A.   Procedural History**

On June 27, 2012, Plaintiff protectively filed an application for SSI, alleging disability as of December 1, 2011. (AR 11.) On October 15, 2012, the SSA denied Plaintiff's initial application. (AR 67-71.) On April 24, 2013, Plaintiff was again denied benefits upon reconsideration. (AR 75-78.)

On February 21, 2014, the ALJ held a hearing to review Plaintiff's case in San Diego, California. (AR 23-49.) Plaintiff and vocational expert Corinne Porter testified at the hearing. (*Id.*)

In a March 14, 2014 decision, the ALJ determined that Plaintiff: (1) had not engaged in substantial gainful activity since June 27, 2012 and (2) suffered a number of severe impairments. (AR 13.) However, based on the full medical and evidentiary record, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 14.) Thus, under 20 C.F.R. § 416.967(c), the ALJ concluded that Plaintiff had the RFC to perform the full range of medium work. (AR 14-18.) Accordingly, the ALJ found that Plaintiff could perform his past relevant work as a paint-and-body auto repairer and was therefore not disabled. (AR 18.)

On March 14, 2014, Plaintiff requested a review of the ALJ's decision. (AR 1.) On September 25, 2015, the Appeals Council denied review. (AR 1-4.) The ALJ's decision thereupon became the SSA's final and definitive determination in Plaintiff's case. 42 U.S.C. § 405(g).

On November 27, 2015, Plaintiff commenced the instant action for judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) On March 15, 2016, Defendant filed an Answer to Plaintiff's Complaint. (Doc. No. 11.) On April 15, 2016, Plaintiff filed a Motion for Summary Judgment ("MSJ"). (Doc. No. 14.) On May 12, 2016, Defendant filed a Cross-Motion for Summary Judgment ("Cross-MSJ") and opposition to Plaintiff's MSJ. (Doc. No. 16.) Plaintiff did not file an opposition to Defendant's Cross-MSJ or a reply to Defendant's opposition to his MSJ.

**B.    Relevant Medical Records Submitted to the ALJ for Review**

**1.    State Agency Physician Reports**

**a.    Dr. Joel Ross, October 15, 2012**

On October 15, 2012, Joel Ross, M.D., performed a residual functional capacity assessment for the State. (AR 51-57.) Dr. Ross noted Plaintiff's history of diabetes, hypertension, arthritis, muscle pain, fatigue, and blurred vision. (AR 51, 54.) Despite these conditions, Dr. Ross concluded Plaintiff was capable of working at a medium exertional level and that he could return to work as "a general supervisor in a[n] autobody [and] car painting [shop]." (AR 53-54.) In reaching this conclusion, Dr. Ross found the objective medical evidence did not support Plaintiff's "statements about the intensity, persistence and functionally limiting effects of the symptoms." (AR 54.) Accordingly, Dr. Ross found Plaintiff was only "partially credible." (*Id.*)

Dr. Ross further opined that Plaintiff could sit, stand, or walk, with normal breaks, for about six hours in an eight-hour day. (AR 55.) Further, Dr. Ross found

Plaintiff could occasionally lift or carry up to 50 pounds and could frequently do the same with 25 pounds. (AR 55.)

Based on the documented findings presented, Dr. Ross determined Plaintiff was not disabled. (AR 57.) Dr. Ross's Personalized Decision Notice told Plaintiff:

> Your condition results in some limitations in your ability to perform work related activities. However, these limitations do not prevent you from performing work you have done in the past as [a] supervisor in the auto body paint shop, as normally performed in the national economy. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information, your age, education, training, and work experience in determining how your condition affects your ability to work.

(AR 57.)

### b.    Dr. K. Wahl, April 24, 2013

On April 24, 2013, K. Wahl, M.D., performed a residual functional capacity assessment for the State. (AR 58-65.) Dr. Wahl noted Plaintiff's history of diabetes, high blood pressure, arthritis, muscle pain, fatigue, and blurred vision. (AR 58, 61.) Despite these conditions, Dr. Wahl, like Dr. Ross, concluded Plaintiff was capable of working at a medium exertional level and that Plaintiff's limitations would not prevent him from returning to work at a paint and body shop. (AR 64.)

In reaching this conclusion, Dr. Wahl also found the objective medical evidence did not support Plaintiff's "statements about the intensity, persistence and functionally limiting effects of the symptoms." (AR 54.) Like Dr. Ross, Dr. Wahl found that Plaintiff was only "partially credible." (AR 62.)

Dr. Wahl further opined Plaintiff could sit, stand, or walk, with normal breaks, for about six hours in an eight-hour day. (AR 55.) Further, Dr. Wahl opined Plaintiff could occasionally lift or carry up to 50 pounds and could frequently do the same with 25 pounds. (AR 55.)

9

In his final determination, Dr. Wahl found Plaintiff was "Not Disabled" and he could perform past relevant work as "Generally Performed in the National Economy." (AR 64.)

**2.    Medical  Records, Vista Community Clinic, May 11, 2012 - December 13, 2013**

Records of Plaintiff's office visits to Vista Community Clinic were submitted as part of the record in three segments, and the Court summarizes each segment in turn.

**a.    May 11, 2012 – September 24, 2012**

During office visits between May 11, 2012 and September 24, 2012, Plaintiff's treating physician typically concluded that Plaintiff had no abnormalities despite his pre-existing medical conditions and complaints. (AR 191-245.) With few exceptions, Plaintiff was considered to have normal muscle function, regular cardiovascular rhythm, normal respiratory function, normal sensory function, normal ranges of motion in all extremities, normal musculosketal results, no edema, no fatigue, and was in no apparent distress. (AR 198, 209, 212, 217, 220, 253, 260, 263, 270, 274.) The exceptions to the otherwise "normal" findings were noted on August 8, 2012, when the treating physician found Plaintiff was experiencing edema in his ankles and on May 23, 2012, when the physician noted that Plaintiff had "right knee tenderness" and "mild crepitis" in both knees. (AR 205, 217.)

During this time period, Plaintiff also complained of pain, but stated that medication or walking relieved the pain. (AR 204.)

With respect to Plaintiff's diabetic condition, his treating physician noted he was compliant with medication and follow-up visits and that Plaintiff was educated on the topic. (AR 197, 214, 219.)

### b.      October 1, 2012 – November 20, 2012

During office visits from October 1, 2012, to November 20, 2012, Plaintiff continued, for the most part, to have "normal" physical examination test results but was found to have a reduced range of motion in his right shoulder on October 24, 2012. (AR 256, 263, 267, 279, 260.) However, X-ray results revealed that Plaintiff's shoulder was normal, and that medication prescribed because of his shoulder pain helped relieve the symptoms. (AR 255-60, 279.)

In regards to his diabetes management during this time period, Plaintiff was directed to maintain a diet low in sodium, fat, and cholesterol. (AR 262-74.) The treating physician noted that Plaintiff possessed the requisite knowledge, willingness, and self-managing skills needed to treat his diabetes. (AR 253, 267, 269, 271, 273.) At the final follow-up appointment during this time period, Plaintiff reported that his blood sugar levels were almost always normal. (AR 252.) It was further noted that Plaintiff did not mention any complications with his diabetes mellitus diagnosis. (AR 267.)

During an office visit on October 24, 2012, Plaintiff stated he had feelings of depression and anxiousness, including thoughts of "death or suicide." (AR 259.) The treating physician, however, noted Plaintiff "never had these feelin[gs]" and that Plaintiff alleviated those feelings "with exercise." (AR 259.) In response to Plaintiff's claims of depression, his physician prescribed Elavil. (AR 261.) On a follow-up visit on November 20, 2012, Plaintiff stated he had been taking Elavil as prescribed and that he was "feeling really well with it." (AR 252.) Plaintiff also stated that he was sleeping well, had less pain, and had less anxiety and depression in a follow-up visit. (AR 252.)

c.   **November 21, 2012 – December 13, 2013**

The final set of medical records from the clinic span from November 21, 2012, until December 13, 2013. (AR 280-319.) After physical examinations during those office visits, Plaintiff again was found to be within normal ranges for muscle function, cardiovascular rhythm, respiratory function, and sensory function. (AR 281, 285, 291-92, 295, 298, 302, 306.)  Plaintiff was also found to be within normal ranges of motion in all extremities, he had no edema or fatigue, and was in no apparent distress. (*Id.*)

As for his diabetes management, Plaintiff was adhering to both medication and follow-up recommendations. (AR 284, 290.) Specifically, his diabetes was being "managed with diet, oral medications and fingerstick blood sugars," and he "possessed knowledge of his diabetes and its management." (AR 297-98, 303.) However, it was also documented that Plaintiff was not adhering to exercise recommendations. (AR 284, 290.) In addition, at times, Plaintiff's sugar levels were "poorly controlled." (AR 301.)

**3.   Disability Report from Field Office**

On July 11, 2012, a Disability Report was filed by a Social Security Representative. (AR 145-47.) The report was filed after the representative conducted a face-to-face interview with Plaintiff.  (AR 145.) The representative noted that she did not observe Plaintiff having difficulty with any of the following: hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing. (AR 146.)

**4.   Disability Report Filed by Plaintiff**

On July 12, 2012, Plaintiff filed a Disability Report with the SSA. (AR 148-54.) In this report, Plaintiff stated that he had diabetes, high blood pressure, arthritis, muscle pain, fatigue, and blurred vision. (AR 149.) However, he stated that his

12

conditions do not cause him pain or other symptoms. (AR 149.) Plaintiff also stated that he had worked at a paint-and-body shop for about 15 years between 1995 and 2010. (AR 150.)

**C.     Plaintiff's Testimony**

Plaintiff testified at the Hearing before the ALJ on February 21, 2014. (AR 23-49.) Plaintiff stated he was born on February 12, 1955 and has the equivalent of a 12th-grade education. (AR 27, 30.) He testified that he currently lives with a 72-year-old friend and that he cleans, cooks, and does both yard work and housework. (AR 28-29.)

Plaintiff stated that he was employed at an auto body shop in the past where he worked on repairing and painting cars. (AR 40.) When painting cars, Plaintiff stated he would lift up to five or six pounds and work for about eight hours a day. (AR 40.) When performing auto body work, Plaintiff stated he "had to lift up to 50 pounds" and "[s]ometimes even more when I had to lift up, like, a companion [sic] and replace it on a car. It took between two men because it just weigh[ed] over 100 pounds easy." (*Id.*)

Plaintiff also performed "handyman work" between 2011 and 2012, but stated he was "not doing anything at all" at the time of the hearing. (AR 32, 41.) He stated that the handyman work consisted of "[m]ore than anything dry wall repair, window cleaning, yard cleaning, [and] maybe some plumber work," but the work was "[n]ot very heavy." (AR 32, 41.)

With respect to his health, Plaintiff stated that if he adhered to his diet and medication, that his blood sugar levels were controlled and testified that sometimes his blood levels go up, but that if he "behave[s] good," they are controlled. (AR 34.)

In regards to his heart palpitations, Plaintiff explained he still experienced palpitations, but his heart condition was managed well with medication. (AR 35-

13

36.) He stated that he was no longer taking the medicine he was prescribed because "[his heart] seem[ed] to be okay." (AR 36.)

Plaintiff was asked about his depression and stated he was still taking medication for it. (AR 36.) Plaintiff further testified that he was sent to see a psychiatrist for his depression, but was never called back in and did not go again. (AR 36-37.) Plaintiff testified that the psychiatrist he visited once did not prescribe him any medication because the psychiatrist did not think it was necessary. (AR 37.)

When Plaintiff was asked about how long he could stand up, he stated he could do so comfortably for about an hour, but would be uncomfortable if he forced himself to do so for three hours "because the pain is just really kind of hard on my . . . bottom part of my feet." (AR 38.) However, he stated he could "sit pretty much okay." (AR 39.) Plaintiff also testified that he had problems and pain in his right shoulder, but agreed the X-ray results showed no skeletal problems. (AR 42-43, 30.)

**D.    Examination of Vocational Expert**

Corrine Porter, a vocational expert, also testified at the hearing. (AR 45-48.) Plaintiff stipulated to the vocational expert's professional qualifications and had no objections to her testimony. (AR 45-46.) The ALJ asked Ms. Porter to assume a hypothetical person is "the same age, same work experience, work is of the medium level description, at medium level exertion [of Plaintiff]. Would that paint and auto body position be available?" (AR 46.) Ms. Porter testified that the person described in the hypothetical could perform Plaintiff's past relevant work as a paint and auto body repairer. (AR 46.) Ms. Porter further testified that there were no transferrable skills from that job description. (AR 47.)

**E.     The ALJ's Findings**[1]

The ALJ made the following pertinent findings:

**1.     The claimant has not engaged in substantial gai nful activity since June 27, 2012, the application date (20 CFR 416.971 *et seq.*).**

**2.     The claimant has the following severe impairments: diabetes mellitus, hypertension; history of heart palpations; osteoarthritis; umbilical hernia; obesity (20 CFR 416.920(c)).**

The above-listed impairments are considered severe because those impairments are more than slight abnormalities and have more than a minimal effect on the claimant's ability to do basic physical and/or mental work activities. The severity of the above listed impairments are established by the objective medical findings, the opinions and conclusions of the treating physicians, laboratory studies and other medical evidence as discussed more fully in Finding 4.

The claimant testified at the hearing that he was recently hospitalized for a virus. The claimant alleged weakness since the hospitalization and that his doctor stated that it could take him t[w]o months to fully recover. The claimant also mentioned he has lost 15 pounds. The undersigned notes there is no medical evidence in the record to support the claimant's allegations. The undersigned further notes that it is unlikely that this condition has lasted or can be expected to last for a continuous period of not less than 12 months. In addition, the claimant alleged he had his hernia for many years, but he has not sought treatment.

**3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

---

[1] The ALJ's findings have been taken verbatim from the record. Quotes and emphasis appear as they do in that docketed compendium, as do any spelling and other errors.

The undersigned has considered the claimant's medically determinable impairments, singly and in combination, under any medical Listings. Based on the medical evidence of record as discussed in Finding 4 below, the undersigned finds the claimant's impairments, considered singly and in combination, do not meet or medically equal the criteria of any medical listing. No treating or examining physician has recorded objective clinical or diagnostic findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show objective clinical or diagnostic findings that are the same or equivalent to those of any listed impairment. A more detailed discussion to support this finding follows in detail below.

**4.     After  careful  consideration  of the entire record, t     he undersigned  finds that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 416.967(c).**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 09-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or symptoms are not substantiated

16

by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant's testimony does not establish any different conclusions than found herein. Although the claimant completed the equivalence of [] the 2nd grade in Mexico, he admitted that h[e] studied a vocational course for paint and body that is equivalen[t] to [] the 12th grade. The claimant testified he was not currently working and last worked in 2011 as a handyman. The claimant stated he could not work because of pain. He said he could not sustain his job duties because of neuropathy. He could not stand for long periods of time. The claimant admitted he continues to do some handyman jobs. He said he does not do much besides cleaning up yards.

The [claimant] testified he had lost weight. He said he is 5 feet and 5 inches tall and weighed 186 pounds. The claimant complained that he was in the hospital for two days and two nights with a high fever and muscle pain. The claimant admitted he felt better. However, he mentioned he had to go back to a neurologist because his lips and tongue were numb.

The claimant admitted he could perform a variety of activities of daily living. He testified that he lives with a good friend and helps around the house. He said he does repairs around the house and trims the rose bushes. He explained he could perform activities of daily living as long as he did not have be on his feet for long periods of time.

The claimant assessed he could not move boxes weighing over 20 pounds because it is difficult due to his problems with his arms. He explained that although his X-ray images of his arms showed he was normal, he said he has osteoarthritis and muscle pain. He specifically mentioned that his arthritis affects his right shoulder. The claimant mentioned he wears a special shoe for his diabetic diagnoses. He said he is compliant with medication and takes his insulin on a daily basis. He also admitted his blood pressure is controlled because he is compliant with medications.

17

The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The undersigned finds the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.

After careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reason explained in the decision. Also, the claims representative conducted a lengthy face-to-face interview with the claimant and noted he had no physical or mental problems. (Ex. 1E, pp. 1-3).

The undersigned has read and considered all of the limited medical evidence submitted by the claimant's representative. Including the claimant's representative's brief (Exs. 12E; 1F-4F). In terms of the claimant's alleged pain, as a matter of law, no symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of medically determinable physical or mental impairments that could reasonably be expected to produce the symptoms. When the existence of medically determinable physical or mental impairments that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptoms and any functions effects (Social Security Ruling ("SSR") 96-7p). As a matter of law, therefore, if the undersigned finds that the claimant's allegations of pain are inconsistent with his reported daily activities, or the objective medical evidence, then the undersigned is required to find the claimant is less than entirely credible. When the primary alleged impairment is

pain, a finding that the claimant's less then entirely credibly can result in a finding of "not disabled."

The medical records indicated the claimant has complained of palp[itations] and pain in his lower back and hands (Ex. 2F, p. 13). However, the claimant admitted that his pain was relieved with diclofenac. *Id.* He also complained of "burning pain" in his feet. But he admitted walking alleviated his pain as well. *Id.* His physical examinations revealed he was overall normal (Ex. 2F). X-ray images of the claimant's shoulder indicated it was normal (Ex. (3F, pp. 10, 34). The claimant noted that indomethacin was helping with his shoulder pain more as well. *Id.*

Although obesity itself is not a listed impairment, the undersigned has considered the potential effects obesity has in causing or contributing to impairments in the musculoskeletal, respiratory, and cardiovascular system and that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately (SSR 02-1p).

The undersigned has considered the potential impact of obesity in causing or contributing to co-existing impairments as required by Social Security Ruling 02-01p. The claimant's history of obesity is evidenced by his weight of 186 to 205 pounds at the height of 5 feet and 5 inched, with a calculated [fn. omitted] body mass index ("BMI") of 30.9 to 34.11[2] (Claimant's Testimony; Ex. 2F, p. 18). The claimant's weight, including the impact on his ability to ambulate as his other body systems has been considered within the limitations of the claimant's residual functional capacity described herein.

> n.2 BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters ($kg/m^2$) (Social Security Ruling 02-1p). For adults, both men and women, the Clinical Guidelines classify a BMI in the range 25-29.9 as "overweight" and a BMI of 30 or above as "obesity." The *Clinical Guidelines* recognize three levels of obesity. A BMI in the range of 30-34.9 is Level I. A BMI in the range of 35-39.9 is Level II. A BMI greater than or equal to 40 is Level III, which is considered "extreme" obesity

15-CV-2664-DMS(WVG)

and represents the greatest risk for developing obesity-related impairments.

Regarding the claimant's hypertension, the medical evidence showed the claimant's hypertension was being managed medically and should be amenable to proper control by adherence to the recommended medical management and medication compliance. The medical records show the claimant's blood pressure is often within normal limits or only slightly elevated[3] (Exs. 2F; 4F). The claimant's blood pressure measured at 112/80, 118/78, 146/80[4] (Exs. 2F, pp. 9, 30; 4F, p. 26). In addition, there is no history of renal insufficiency, myocardial infarct, cerebrovascular accident, retinal damage, or functional limitations related to the claimant's elevated blood pressures. The claimant has been compliant with medications and his hypertension has generally been controlled with medications (Ex. 4F, p. 18).

n.3 For adults, the American Heart Association defines normal blood pressure at less than 120/80 and defines hypertension or high blood pressure at 140/90 or higher.

n.4 A medical report noted the claimant's blood pressure increase was due to him not taking medications for more than several months (Ex. 4F, p. 26). Otherwise, the medical records showed that his hypertension is controlled when he is compliant with medications.

Regarding the claimant's diagnosis of diabetes mellitus, the undersigned notes there is no medical listing for diabetes mellitus. The undersigned evaluated the claimant's diabetes mellitus under the listings for other body systems pursuant to the guidance in section 9.00 of the Listing of Impairments. The medical evidence showed the claimant's diabetes was being managed medically and should be amenable to proper control by adherence to recommended medical management and medication compliance (the claimant's testimony). There is no evidence the claimant suffered any end organ damage. Moreover, the claimant had no significant problems with his vision, kidneys, hands, or feet (Exs. 1F; 2F; 3F). Specifically, a medical report, dated September 24, 2012 indicated the claimant has been diagnosed with diabetes but it was managed with oral medications (Ex. 2F, p. 7).

20

The claimant has been compliant with medications. *Id.* However, it was noted the claimant was not "adhering to exercise recommendations for his diabetes mellitus"[5] (Ex 4F, pp. 4, 11). Overall, the medical records showed the claimant was "doing well with medication" (Exs. 2F, p. 20; 3F).

> n.5 This demonstrates a possible unwillingness to do what is necessary to improve his condition. It may also be an indication that the claimant's symptoms were not as severe as the claimant purported. This evidence of noncompliance undermines the credibility of the claimant's subjective complaints and alleged disability. Although the failure to follow prescribed treatment without a good reason can be the basis for a finding that the claimant is not disabled, the undersigned considered it as a credibility factor in this case and does not base the ultimate decision in this case on the factor alone (20 CFR 416.930).

The undersigned has read and considered all of the State agency physician's reports (Exs. 2A; 3A). In determining the claimant's residual functional capacity, the undersigned has given significant weight, but not full weight, to the opinions of the State agency medical psychological consultants on initial review on reconsideration. The opinions of all of these physicians are generally consistent in that they all assess the claimant is able to perform a range of work at the medium exertional level with some difference in the degree of specific function-by-function limitations. These opinions are all reasonable and supported by the record as a whole. No single assessment has been completely adopted as the residual functional capacity determined herein. The undersigned has adopted those specific restrictions on a function-by-function basis that are best supported by the objective evidence as a whole. There is no medical source statement from any source that suggests functional limitations more restrictive than the residual functional capacity found in this decision. There is no medical source statement of functional limitations from any source.

In sum, the above residual functional capacity assessment is supported by the evidence as a whole. The claimant's subjective complaints are

21

less than fully credibly and the objective medical evidence does not support the alleged severity of symptoms. The claimant's limitations would not preclude the performance of substantial gainful activity. For all the foregoing reasons, the undersigned finds the claimant was not under a disability as defined in the Social Security Act, at any time since June 27, 2012, the date the application was filed.

**5.      The claimant is capable of performing past relevant work as a Paint and Body Auto Rep airer. This work does not req uire the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).**

. . . .

**6.      The claimant has not been und er a disability, as defined in the Social Security Act, since June27, 2012, the date the application was filed (20 CFR 416.920(f)).**

(AR 13-18.)

**F.      The Parties' Arguments**

**1.      Plaintiff's Arguments**

Plaintiff's sole basis for his summary judgment motion is that the ALJ erred by finding that Plaintiff was only partially credible. (Doc. No. 14 at 4.) Plaintiff argues he demonstrated the existence of "a condition that would cause some degree of pain and dysfunction," and that the ALJ failed to articulate "specific and legitimate reasons for rejecting the pain and limitation testimony." (*Id.* at 5.) Specifically, Plaintiff contends that the ALJ made three specific errors:

> [T]he ALJ found [Plaintiff's] testimony not credible because of [1] certain daily activities, [2] a social security claims representative did not observe any physical or mental limitations, [3] and a record notation finding [Plaintiff] did not adhere to diet recommendations.

(Doc. No. 14 at 6.)

22

### 2.    Defendant's Arguments

Defendant contends the ALJ's findings on Plaintiff's credibility rests on substantial evidence and should be affirmed, and in the alternative, that there is "clear and convincing evidence" to uphold the ALJ's decision as well. (Doc. No. 16-1 at 7 n.2.) Defendant's Cross-MSJ addresses Plaintiff's three contentions of error and further argues that the ALJ properly found that Plaintiff was not credible based on five criteria:

> (1) the objective medical evidence; (2) the State agency physicians all opined that [Plaintiff] was capable of medium exertion work; (3) medications and physical activity were effective in controlling his hypertension, palpitations, pain, and diabetes; (4) his activities of daily living showed more functional ability than alleged; and (5) the observations of an agency claims representative.

(Doc. No. 16-1 at 12.) Defendant accordingly seeks summary judgment affirming the ALJ's decision.

### III.

### STANDARD OF REVIEW

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must initially determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* "When an [ALJ] determines that a claimant for Social Security benefits is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."

*Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015). The ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989).

The clear and convincing standard is "the most demanding required in Social Security cases" and "is not an easy requirement to meet." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). To permit meaningful judicial review of the credibility determination, the ALJ must "specify which testimony she finds not credible, and then provide clear and convincing reasons supported by evidence in the record to support that credibility determination." *Brown-Hunter*, 806 F.3d at 488-89. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

The ALJ may also consider the factors listed in Social Security Ruling 88-13, which include:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication; 4. Treatment, other than medication, for relief of pain; 5. Functional restrictions; and 6. The claimant's daily activities.

*Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

Furthermore, even if one or more reasons listed by the ALJ are invalid, so long as the ALJ provides some valid reasons, the ALJ's credibility determination will be upheld. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1162-63 (9th Cir. 2008).

**IV.**

**DISCUSSION**

**A.     Plaintiff is Not Entitled to Summary Judgment; the ALJ Did Not Err**

Because, at step one, the ALJ found that "[a]fter careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," and made no findings on malingering, the Court's task is to determine whether the ALJ's adverse credibility finding is supported by substantial evidence under the clear-and-convincing standard. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1160, 1161 (9th Cir. 2008). Based on the undersigned's review of the entire record, the ALJ did not err in discounting Plaintiff's testimony. The ALJ clearly and convincingly explained why Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR at 16-18.) The Court will first address Plaintiff's main three points of contention, in turn, and then will discuss the ALJ's other findings that support the ALJ's decision.

**1.     Daily Activities**

Although Plaintiff notes that the ALJ took issue with his daily activities, (Doc. No. 14 at 6), the "ALJ was permitted to consider daily living activities in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); Social Security Ruling 88-13.

In evaluating the claimant's testimony, "the ALJ may use ordinary techniques of credibility evaluation; for instance . . . whether the claimant engages in *daily activities* inconsistent with the alleged symptoms." *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012) (emphasis added). "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's

25

testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* at 1113.

Here, the ALJ specifically found that Plaintiff "admitted he could perform a variety of activities of daily living" including "handyman jobs" and "cleaning up yards," (AR 15), and the medical records also support this finding.[2] Specifically, the ALJ found:

> The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The undersigned finds the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.

(AR 15.)

The ALJ did not err. The ALJ first properly identified the specific portion of Plaintiff's testimony that was in doubt: the intensity, persistence, and limiting effects of his impairments. The ALJ then properly provided specific reasons for doubting that testimony based on Plaintiff's daily activities. The ALJ finally explained why those daily activities undermined the claimed intensity, persistence, and limited effect of Plaintiff's impairments. In doing so, the ALJ implicitly recognized that yard work and handyman tasks are inherently physical activities and accordingly explained that the physical, mental, and social capacity required for these activities undermined Plaintiff's complaints of disabling symptoms and limitations. In other words, the ALJ discounted Plaintiff's credibility because he

---

[2] For example, Plaintiff told his treating physician he was doing handyman work on May 25, 2012. (AR 214.)

found Plaintiff's daily activities were inconsistent with his allegations of disability. This was a permissible finding.  *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

### 2.    Observations of Social Security Claims Representative

Plaintiff contends the ALJ erred when he considered observations a Social Security Claims Representative made about Plaintiff. However, the ALJ complied with the Act's Regulations and Rulings when he considered these observations in forming his credibility assessment. *See* 20 C.F.R. § 416.929 (c)(1)-(c)(4); SSR 96-7P. Regulation SSR 96-7p, which was in effect when the ALJ issued his final decision, mandates that the "adjudicator must also consider any observations about the [claimant] recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone."

Here, the ALJ noted that the Social Security Representative "conducted a lengthy face-to-face interview with the claimant [Plaintiff] and noted he had no physical or mental problems." (AR 16.) Contrary to Plaintiff's assertion that this was improper, it would have been improper for the ALJ to *not* consider this information. Because the ALJ complied with governing agency policy, the ALJ did not err when he considered the Social Security Claims Representative's Field Report.

### 3.    Record  Notation Finding Pl   aintiff  Did Not Adhere to Diet Recommendations

Plaintiff next contends the ALJ erred when he considered Plaintiff's "failure to follow a diet recommendation" during the disability assessment. As an initial matter, it appears Plaintiff confuses "diet" with "exercise," as there is no notation throughout the record where the ALJ faults Plaintiff for his poor diet. However, the ALJ did note Plaintiff was not "adhering to exercise recommendations for his

27

1    diabetes mellitus. (Ex. 4F, pp. 4, 11)." (AR 17.) To the extent Plaintiff intended to

2    object to the ALJ's consideration of his diet, he is not entitled to summary judgment

3    on that basis—the ALJ did not consider his diet. To the extent Plaintiff actually

4    intended to challenge the ALJ's consideration for his failure to engage in exercise,

5    the Court will now address that argument.

6            The Act provides, in pertinent part: "If you do not follow the prescribed

7    treatment without a good reason, we will not find you disabled or blind or, if you are

8    already receiving benefits, we will stop paying you benefits." 20 C.F.R.

9    § 416.930(b); *see also Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012) (a claimant's

10   failure to adhere to a course of treatment without justification can be a permissible

11   reason to discount his credibility).). For example, failure to follow exercise

12   recommendations supports an ALJ's adverse credibility finding and militates against

13   a finding of disability. *See, e.g.*, *Coleman v. Astrue*, 423 Fed. Appx. 754, 756 (9th

14   Cir. 2011) (upholding ALJ's adverse credibility determination where claimant failed

15   "to follow repeated medical recommendations that she treat her pain with exercise

16   and increased activity levels.") (citation omitted) (unpublished); *Montalvo v. Astrue*,

17   237 F. App'x 259, 262 (9th Cir. 2007) (upholding ALJ's adverse credibility

18   determination when the claimant, inter alia, "did not exercise despite that physician's

19   recommendation to do regular stretching and range-of-motion exercises.")

20   (unpublished). Accordingly, the ALJ was allowed to consider such evidence as part

21   of his overall analysis.

22           Here, part of Plaintiff's treatment regimen was to adhere to exercise

23   recommendations. (AR 17, 284, 290.) Plaintiff gave no "good reason" for why he

24   was not compliant with this exercise recommendation. (AR 17.) Moreover, the ALJ

25   did not base his decision exclusively on this finding and stated:

26           Although the failure to follow prescribed treatment without a good reason
             can be the basis for a finding that the claimant is not disabled, the undersigned

                                             28

considered it as a credibility factor in this case and does not base the ultimate decision in this case on the factor alone (20 CFR 416.930).

(AR 17 n.5.) The ALJ considered Plaintiff's failure to follow the recommend exercise plan as part of his overall analysis. He did so in conformity with the Act and caselaw that permitted him to do so. Accordingly, the ALJ did not err when he considered Plaintiff's failure to adhere to an exercise plan.

### 4.  The ALJ Articulated Other Specific, Clear and Convincing Reasons That Support His Credibility Determination[3]

Other portions of the record support the ALJ's credibility determination. First, the ALJ partly based his credibility analysis on the objective medical evidence as a whole and found that "[t]here is no medical source statement from any source that suggests functional limitation more restrictive than the residual functional capacity found in this decision." (AR 18.) This was an accurate assessment of the medical evidence before the ALJ. Both state physicians who examined and observed Plaintiff concluded he was capable of working at a medium exertional level and could return to work. (AR 53-54, 64.) No contrary finding exists in the record. "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 CFR § 404.1 527(c)(4).

Second, the ALJ properly concluded that Plaintiff's shoulder was normal. (AR 16.) Plaintiff complained of shoulder pain, but X-ray results revealed that there was no skeletal abnormality in Plaintiff's shoulder, and medication helped relieve his shoulder pain and symptoms. (AR 255-60, 279.)

Finally, the ALJ also considered that Plaintiff's "physical examinations revealed he was overall normal." (AR 16.) This finding was also reasonably based

---

[3] The following does not purport to be an exhaustive list of all the ALJ's findings, but the Court finds them especially convincing.

29

on the objective medical evidence before the ALJ. The medical record evinces that for the majority of Plaintiff's clinic visits, he was considered to have normal muscle function, regular cardiovascular rhythm, normal respiratory function, normal sensory function, normal ranges of motion in all extremities, normal musculoskeletal results, no edema, no fatigue, and was in no apparent distress. (AR 198, 209, 212, 217, 220, 253, 256, 260, 263, 267, 270, 274, 279, 281, 285, 291-92, 295, 298, 302, 306.) The exceptions to the otherwise normal findings were either momentary or else anomalous.[4]

Based on the foregoing, the ALJ's credibility finding was not erroneous, and Plaintiff's summary judgment motion should be DENIED.

**B.     Defendant is Entitled to Summary Judgment**

In addition to Plaintiff's summary judgment motion, Defendant's cross-motion for summary judgment is pending before the Court.  Defendant argues the ALJ properly concluded that Plaintiff's complaints of total disability were not credible based on five criteria: (1) the objective medical evidence; (2) the State agency physicians all opined that he was capable of medium exertion work; (3) medications and physical activity were effective in controlling his hypertension, palpitations, pain, and diabetes; (4) his activities of daily living showed more functional ability than alleged; and (5) the observations of an agency claims representative. Plaintiff did not file an opposition to the Cross-MSJ and has not raised any other argument not already addressed in this Report and Recommendation.

---

[4] For example, Plaintiff's depression was quickly resolved with medication and physical activity, and edema in his ankles was only noted once. (AR 252, 259-61, 205.)

As discussed extensively above, the ALJ provided these specific reasons for its conclusion of Plaintiff's non-disability, and the record amply supports the ALJ's findings.   Moreover, with respect to Plaintiff's credibility and claims of greater disability, the ALJ specifically identified which portions of Plaintiff's testimony were credible and, as discussed above, provided clear and convincing reasons for discounting other portions of the testimony. Contrary to Plaintiff's argument, the ALJ properly evaluated, among other things, Plaintiff's treatment and examination records, his participation in daily activities, and his non-compliance with exercise recommendations.   The Court recommends that Defendant's Cross-MSJ be GRANTED.[5]

## VI.

## CONCLUSION

Based on the foregoing, the ALJ did not err in discounting Plaintiff's testimony because he provided specific, clear and convincing reasons which were supported by substantial evidence. Accordingly, this Court RECOMMENDS that Plaintiff's MSJ be DENIED and that Defendant's Cross-MSJ be GRANTED. This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

**IT IS ORDERED** that **no later than December 19, 2016**, any party to this action may file written objection with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

---

[5] It also should be noted that Plaintiff did not file an opposition to Defendant's summary judgment motion and that such failure may constitute consent to granting Defendant's summary judgment motion or the waiver of arguments in opposition thereto.  S.D. Cal. Civ. L. R. 7.1(f)(3)(c).

31

1      **IT IS FURTHER ORDERED** that any reply to the objections shall be filed

2  with the court and served on all parties **no later than January 9, 2017**. The parties

3  are advised that failure to file objections within the specific time may waive the

4  right to raise those objections on the appeal.

5      **IT IS SO ORDERED.**

6  DATED: November 17, 2016

7

8  _____

9  Hon. William V. Gallo
  United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

32